IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JULIO SANCHEZ, (R-26026 ), | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 09 C 2289 |
| | ) |
| | ) Judge Sharon J. Coleman |
| ROGER WALKER, et al., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Julio Sanchez, currently an inmate at the Illinois River Correctional Center, filed this 42 U.S.C. § 1983 action against Stateville Correctional Center's former warden Terry McCann, Assistant Warden Venita Wright, Correctional Officers Rodriguez and Turner, and Grievance Officer Ami Workman ("Defendants"). Briefly stated, Plaintiff alleges the following. In May 2007, he was ordered to take a urine drug test, which showed positive for marijuana use. Plaintiff's requests to take another test were refused. Disciplinary proceedings ensued. He contends that he was not present at the second disciplinary hearing. He was found guilty and sentenced to six months of segregation confinement. Plaintiff further alleges that the conditions in segregation confinement (unclean and roach/vermin infested) were unconstitutional. He also states that Defendants refused to address his grievances challenging his disciplinary procedures and the conditions of his segregation.

On April 2, 2010, the court granted in part, and denied in part, Defendants' motion to dismiss. (R. 51.) The court dismissed Plaintiff's claims that he had to endure rust on the bars on his

segregation cell and a lead-based undercoat in the paint on the walls. The court allowed his other claims to proceed.

Currently before the court is Defendants' joint motion for summary judgment. Plaintiff has responded, and Defendants have replied. For the following reasons, the court grants the motion.

## I. STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). In determining the existence of a genuine issue of material fact, the court construes all facts in a light most favorable to the non-moving party (Plaintiff in this case) and draws all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

If the moving parties meets their burden of showing that there are no issues of material fact and that they are entitled to a judgment as a mater of law, the non-moving party must "go beyond the pleadings and affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact." *Borello v. Allison*, 446 F.3d 742, 748 (7th Cir. 2006) (internal quotation marks and citations omitted); *Celotex*, 477 U.S. at 322-26. A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of

material fact exists only if a reasonable finder of fact could return a decision for the nonmoving party based upon the record. *See Anderson*, 477 U.S. at 252; *Insolia v. Phillip Morris Inc.*, 216 F.3d 596 (7th Cir. 2000).

When addressing a summary judgment motion, the court derives the background facts from the parties' Local Rule 56.1 Statements, which assist the court by "organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side propose[s] to prove a disputed fact with admissible evidence." *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000). Because Plaintiff is proceeding *pro se*, Defendants served him with a "Notice to *Pro Se* Litigant Opposing Motion for Summary Judgment" as required by N.D. Ill. Local Rule 56.2. (R. 89.) The notice explains the consequences of failing to properly respond to a motion for summary judgment and to the undisputed material facts in the movant's Local Rule 56.1 Statement. (*Id.*) A litigant's failure to respond to a statement of fact in a Local Rule 56.1 Statement results in the court considering the uncontroverted statement admitted. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006). The court may also disregard responses that do not properly cite to the record or that offer only evasive denials. *Cichon v. Exelon Generation Co.*, 401 F.3d 803, 809-10 (7th Cir. 2005); *Brasic v. Heinemann's Inc.*, 121 F.3d 281, 284 (7th Cir. 1997).

In the present case, Defendants filed their Rule 56.1 Statement (R. 88) and provided notice to Plaintiff of his need to respond. (R. 89.) Plaintiff did not respond, but instead, submitted his own Rule 56.1 Statement. (R. 99) Defendants responded to Plaintiff's Statement. (R. 103.) Defendants contend that, because Plaintiff did not respond to their Rule 56.1 Statement, the court may deem the uncontested facts contained therein admitted. (R. 102.) Defendants are correct. Under Rule 56.1(b), a party opposing a motion for summary judgment must first respond to the uncontested

facts stated in the movant's Rule 56.1 Statement, and then submit his or her own Rule 56.1 Statement to provide additional facts not addressed by the movant's Rule 56.1 Statement. *See* Rule 56.1(b)(3) (B) and (C). The court may thus consider Defendants' Rule 56.1 Statement's facts admitted, to the extent they are supported by the record. *Raymond*, 442 F.3d at 608.

However, the court must also consider Plaintiff's Rule 56.1 Statement. Accordingly, the analysis below deems the facts in Defendants' Rule 56.1 Statement admitted, but notes where Plaintiff's Rule 56.1 factual statements address the same factual issue. With these standards in mind, the court considers the evidence of this case.

## II.  FACTS

Julio Sanchez entered Stateville Correctional Center in November 2001. (R. 88, Defs.' Rule 56.1 Statement, ¶ 2, Exh. B, Pl.'s Depo., 11.) In 2007, Terry McCann was Warden, Vernita Wright was Assistant Warden, Ami Workman was a grievance officer, and Salvador Rodriguez and Leslie Turner were Internal Affairs officers. (R. 88, ¶¶ 3-7.) On May 2, 2007, Officer Rodriguez requested Plaintiff to provide a urine sample for drug testing. (*Id.*, ¶ 8.) About 30 minutes after Plaintiff provided a sample, Officer Turner informed Plaintiff that he tested positive for marijuana. (*Id.*, ¶ 9.) Plaintiff objected, contending that the plastic cup must have been tainted. (*Id.*) Plaintiff requested that he be retested using a blood or hair test.. (*Id.*) Turner refused, possibly because he did not have authority to order that Plaintiff use other forms of testing. (*Id.*, 10.)

Plaintiff was issued a disciplinary ticket that stated that he tested positive for marijuana. (*Id.*, 14.) The ticket mistakenly stated that the test occurred on May 1st, as opposed to May 2, 2007. (*Id.*) On May 9, 2007, Plaintiff attended a disciplinary hearing. According to the disciplinary hearing officer, Daryl Johnson, Plaintiff admitted to the following: he provided a urine sample on

May 2, 2007, the sample tested positive, and he was not taking any medication that might have caused a false-positive result. (*Id.*, ¶ 17; R. 88, Exh. D, Johnson Aff. ¶ 3; *see also* R. 22, Amended Compl., p.60-61 (copy of Final Summary Report).) Johnson states that Plaintiff contended that the sample cup was contaminated. (R. 88, Exh. D, Johnson Aff. ¶ 3.) According to Plaintiff, he pleaded not guilty to the charge, and denied that he submitted to a urine test on May 1, 2007. (R. 99, Pl.'s Rule 56.1 Statement ¶¶ 12-13.) He further states that he never said at the May 9, 2007, hearing that was not taking medications. (*Id.*)

Because of the wrong date of the ticket, Johnson remanded the ticket to the issuing officer for clarification. (R. 88, ¶ 18.) Officer Rodriguez issued an amended ticket with May 2, 2007, as the date of the drug test. (*Id.*) On May 15, 2007, Johnson reviewed the amended ticket, but did not conduct another hearing. Johnson explains that, although his May 15, 2007, Final Summary Report states in its heading "Hearing Date/Time 5/15/07," he was using a computerized form that automatically includes such language. (R. 88, Exh. D, Johnson Aff., ¶ 6.) Instead of conducting a second hearing, Johnson considered Plaintiff's statements from the May 9, 2007, hearing, as well as staff records, and issued a Final Summary Report. (*Id.*, ¶ 5.) The Final Summary Report states that Plaintiff was present at the hearing (referring to the 5/9/07 hearing) and that Johnson considered Plaintiff's statements, the record, and the amended ticket. (*Id.*, 20-22.) Plaintiff was sentenced to six months of segregation. (*Id.*, ¶ 25.)

Plaintiff's period of segregation was spent in Stateville's F-House. (R. 88, Defs.' Rule 56.1 Statement, ¶ 35.) Plaintiff's complaints about segregation consist of the following issues: a greater pest infestation problem; slower collection of food trays after meals; a stained toilet; a lack of cleaning supplies; and a skin rash allegedly resulting from unclean conditions. (*Id.*, ¶¶ 35-42.)

With respect to pest infestation, Plaintiff contends that there were cockroaches, little black bugs, spiders, and mice. (*Id.*, ¶ 37.) Plaintiff contends that officers picked up food trays when the next meal was served instead of retrieving the trays immediately after meals, possibly contributing to the pest problem . (*Id.* ¶ 35.) Defendants have submitted a copy of a contract between the prison and an exterminator (Critter Ridder), as well as records showing that an exterminator sprayed F-House's segregation area once a month (5/17/07, 6/21/07, 7/19/07, 8/16/07, 9/20/07, 10/22/07) during Plaintiff's six-month segregation stay. (*Id.* ¶ 38-39, Exh. F (exterminator contract and records)). Plaintiff does not contest that an exterminator sprayed the segregation area. He instead contends that the exterminator did not spray inside the inmate cells, as spraying was done in general population. (R. 99, Pl.'s Rule 56.1 Statement, ¶ 22.)

Plaintiff contends that he was not given cleaning supplies in segregation. In general population, Plaintiff allegedly received a spray bottle of soap, a scrub bush, a dust pan, and a mop. (R. 88, Defs.' Rule 56.1 Statement, ¶ 41.) In general population, Plaintiff and other inmates used their clothes to clean and then washed their clothes. (*Id.*)

The steel toilet in Plaintiff's cell had a hard, brownish build-up inside the bowl above the water line that smelled like urine. (*Id.*, ¶ 40.) There is no indication that the toilet did not work properly.

While he was in segregation, Plaintiff developed a skin rash, which was diagnosed as *tinea corporis*, a condition related to athlete's foot. (*Id.*, ¶ 42.) Plaintiff contends that the evidence is contested as to whether his fungal infection was caused by the conditions in segregation. (R. 99, Pl.'s Rule 56.1 Statement, ¶ 23.)

After Plaintiff's six-month segregation, he was moved from gallery one in F-House to gallery four of F-House for approximately two months. (R. 88, Defs.' Rule 56.1 Statement, ¶ 45.) Plaintiff stated that the same conditions in gallery one existed in gallery four. (*Id.)*

Plaintiff filed several grievances: one about the drug test being contaminated, another about there being a hearing on May 15, 2007, and two about the conditions of his segregation confinement. (R. 88, Defs.' Rule 56.1 Statement, ¶¶ 26, 30, 46.) With respect to his grievance about the drug test, Ami Workman denied it, (*id.*, ¶ 26.), and the Administrative Review Board in Springfield, Illinois denied Plaintiff's appeal. (*Id.*, ¶ 27.) With his second grievance about the May 15, 2007, hearing, Plaintiff was instructed to first speak to his counselor, which Plaintiff did. However, because the counselor concluded that Plaintiff's claims had already been addressed in the first grievance, the counselor did not forward the grievance to be addressed. (*Id.*, ¶ 31-32; R. 88, Exh. E, Affidavit of Ami Workman.) Plaintiff wrote letters to Warden Terry McCann and Assistant Warden Vernita Wright; however the only response he received was to file a grievance. (R. 88, Defs.' Rule 56.1 Statement, ¶33; Exh. B, Pl.'s Depo. 55.) Plaintiff filed two grievances about the conditions of his confinement. (*Id.*, ¶ 46; R. 99, Pl's Rule 56.1 Statement, ¶ 19, Exh. K.) Plaintiff states that he provided these grievances to his counselor. (R. 99, Pl.'s Rule 56.1 Statement, ¶ 19.) Plaintiff never received a response. (R. 88, Exh. B, Pl.'s Depo., 89-91.) Defendant Ami Workman was not assigned to address these grievances, and Plaintiff never forwarded copies of them or letters about them to McCann and Wright. (R. 88, Defs.' Rule 56.1 Statement, ¶¶ 47-48.)

### III. DISCUSSION

Plaintiff alleges the following claims in this case: (1) he was denied due process rights with respect to his disciplinary proceedings, (2) the conditions of his segregation confinement were

unconstitutionally deficient and Defendants acted with deliberate indifference to the conditions, and (3) he received either no response or inadequate responses to grievances about the disciplinary proceedings and his segregation conditions. Defendants contend that they are entitled to summary judgment based upon the following: (1) Plaintiff's segregation was not atypical or significantly harsh to trigger constitutional due process concerns for his disciplinary proceedings; even if constitutional due process concerns applied to Plaintiff's disciplinary proceedings, he was afforded due process; (2) Plaintiff cannot establish a deliberate indifference claim with respect to the conditions of his segregation confinement; and (3) Plaintiff had no constitutional rights to have his grievances heard.

### A. Procedural due process with disciplinary proceedings

#### 1. Plaintiff's segregation did not give rise to procedural due process rights

A prisoner is entitled to due process protections before being deprived of a constitutional liberty interest. *Lekas v. Briley*, 405 F.3d 602, 606 (7th Cir. 2005). Such protections include: advance written notice of the charges, the chance to present testimony and documentary evidence to an impartial decisionmaker, and a written explanation supported by at least "some evidence" in the record. *Lagerstrom v. Kingston*, 463 F.3d 621, 624 (7th Cir. 2006), citing *Wolff v. McDonnell*, 418 U.S. 539, 564-66 (1974).

However, such due process rights apply only with the deprivation of a constitutional liberty interest. A prisoner's constitutional liberty interest extends only to freedoms from deprivations that "impose[ ] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995). In the absence of such "atypical and significant" deprivations, the procedural protections of the Due Process Clause do not apply. *Id.*

With respect to a disciplinary action for which the only penalty is the placement of a prisoner in segregation, courts must determine if the segregation conditions amounted to an "atypical, significant deprivation." *Sandin,* 515 U.S. at 486. This is so because disciplinary segregation usually does "not exceed similar, but totally discretionary, confinement in either duration or degree of restriction." *Id.* at 486-87; *Marion v. Columbia Correction Inst.*, 559 F.3d 693, 697 (7th Cir. 2009). A substantially long segregation confinement with unusually harsh conditions can implicate procedural due process concerns. *Marion*, 559 F.3d at 697-98. A segregation period of six months – like Plaintiff's – does not itself implicate constitutional due process concerns. *Marion*. 559 F.3d at 697-98 (240-day segregation period by itself did not implicate constitutional procedural concerns); *Whitford v. Boglino*, 63 F.3d 527, 533 (7th Cir. 1995) (six months of segregation is "not such an extreme term" and, standing alone, does not trigger due process rights). Rather, such a segregation confinement requires "scrutiny of the actual conditions of segregation." *Marion*, 559 F.3d at 698.

This court's April 2, 2010, opinion denying Defendants' motion to dismiss sought development of the record to address the conditions of Plaintiff's segregation confinement to determine whether his six-month segregation penalty triggered constitutional due process concerns. (R. 52.) The parties having so developed the record, it is now clear that Plaintiff's segregation confinement did not give rise to a constitutional liberty interest.

According to Plaintiff, his segregation confinement differed from his confinement in general population with respect to four conditions; (1) less frequent removal of food trays, (2) an unsanitary toilet, (3) less or no access to cleaning supplies, and (4) a greater rodent and insect infestation. (R. 88, Exh. B, Pl.'s Depo, 71.) Concerning food trays, Plaintiff states that trays from one meal were

Page 9 of 20

not picked up until trays for the next meal were delivered several hours later. (*Id.*, 72.) Unless an inmate finished a meal and returned the tray to the "chuckhole" while officers were still passing out that meal, the inmate would have to keep the tray until the next meal delivery. (*Id.*, 73.) Inmates in segregation did not receive garbage bags, and officers did not routinely collect trash from inmates other than removing food trays. (*Id.*, 73-74.) Plaintiff stated, however, that his trash consisted of food, some cosmetic items like deodorant and toothpaste, and a toilet-paper dispenser roll. Such items would fit on a food tray and could be removed when the tray was collected. (*Id.*, 73-74.)

Plaintiff contends that his steel toilet had a "brownish buildup" above the water line, which was "hard, . . . like a rock" and which "smell[ed] like urine." (*Id.*, 76.) Plaintiff sometimes saw roaches and little black bugs around that area of the toilet. (*Id.*, 76-77.) Inmates were allowed to flush only once every fifteen minutes. (*Id.*, 77.)

Plaintiff allegedly received no cleaning supplies while in F-House. (*Id.*, 78.) When he was in general population in B and E-House, officers brought spray bottles of soap, a dustpan, broom, and sometimes a scrub brush once a week. Inmates in general population were not given a rag to clean with; instead, they used their own clothes. (*Id.*, 79-80.)

Plaintiff described there being cockroaches, black bugs that were "sort of like beetles," spiders, and mice in F-House. (*Id.*, 81-82.) Plaintiff stated that there were insects in general population, but the problem was worse in F-House. (*Id.*, 84-85.) The parties do not dispute that the prison had a contract with Critter Ridder, an exterminator, during the time that Plaintiff was housed in segregation. The evidence also shows that an exterminator sprayed F-House once a month (5/17/07, 6/21/07, 7/19/07, 8/16/07, 9/20/07, 10/22/07) while Plaintiff was in segregation. (R. 88, Defs.' Rule 56.1 Statement, ¶ 39, Exh. F.) The only difference between the extermination in

not picked up until trays for the next meal were delivered several hours later. (*Id.*, 72.) Unless an inmate finished a meal and returned the tray to the "chuckhole" while officers were still passing out that meal, the inmate would have to keep the tray until the next meal delivery. (*Id.*, 73.) Inmates in segregation did not receive garbage bags, and officers did not routinely collect trash from inmates other than removing food trays. (*Id.*, 73-74.) Plaintiff stated, however, that his trash consisted of food, some cosmetic items like deodorant and toothpaste, and a toilet-paper dispenser roll. Such items would fit on a food tray and could be removed when the tray was collected. (*Id.*, 73-74.)

Plaintiff contends that his steel toilet had a "brownish buildup" above the water line, which was "hard, . . . like a rock" and which "smell[ed] like urine." (*Id.*, 76.) Plaintiff sometimes saw roaches and little black bugs around that area of the toilet. (*Id.*, 76-77.) Inmates were allowed to flush only once every fifteen minutes. (*Id.*, 77.)

Plaintiff allegedly received no cleaning supplies while in F-House. (*Id.*, 78.) When he was in general population in B and E-House, officers brought spray bottles of soap, a dustpan, broom, and sometimes a scrub brush once a week. Inmates in general population were not given a rag to clean with; instead, they used their own clothes. (*Id.*, 79-80.)

Plaintiff described there being cockroaches, black bugs that were "sort of like beetles," spiders, and mice in F-House. (*Id.*, 81-82.) Plaintiff stated that there were insects in general population, but the problem was worse in F-House. (*Id.*, 84-85.) The parties do not dispute that the prison had a contract with Critter Ridder, an exterminator, during the time that Plaintiff was housed in segregation. The evidence also shows that an exterminator sprayed F-House once a month (5/17/07, 6/21/07, 7/19/07, 8/16/07, 9/20/07, 10/22/07) while Plaintiff was in segregation. (R. 88, Defs.' Rule 56.1 Statement, ¶ 39, Exh. F.) The only difference between the extermination in

general population and F-House, according to Plaintiff, is that the exterminator did not spray the inside of segregation cells as was done in other areas of the prison. (R. 99, Pl.'s Rule 56.1 Statement, ¶ 22.)

Plaintiff indicates that the adverse conditions described above were throughout F-House and were not limited to the floors where inmates were kept in segregation. (R. 88, Exh. B, Pl.'s Depo, 70.)

The conditions of Plaintiff's disciplinary segregation demonstrate that he cannot establish a constitutional liberty interest for two reasons. First, the conditions of his segregation did not impose an atypical and significant hardship in relation to the ordinary incidents of prison life. *Sandin*, 515 U.S. at 483-84. The Seventh Circuit has had the opportunity on several occasions to address the conditions of disciplinary segregation at Stateville, and on each occasion has found that the conditions were not significantly harsh or atypical to implicate due process concerns. *See Lekas v. Briley*, 405 F.3d 602, 605, 610-11 (7th Cir. 2005) (90 days of segregation at Stateville, which involved the denial of access to prison educational and other programs, restricted movement outside of a cell, less access to outside yard; no ability to exercise, reduced commissary and visitation privileges, and less contact with people was not atypical of the ordinary incidents of prison life to trigger due process concerns); *Thomas v. Ramos*, 130 F.3d 754 (7th Cir. 1997) (70 days of 24-hour cell confinement in a small cell with another inmate, no access to prison work or educational programs, no access to the prison yard, day room, or gym, and no ability to leave cell except for doctor visits and to see the segregation superintendent was not significantly harsh to give rise to procedural due process concerns); *Williams v. Ramos*, 71 F.3d 1246 (7th Cir. 1995) (19 days in segregation with 24-hour cell confinement with no access to general population programs or other

prisoners and being handcuffed on the few occasions inmate exited cell did not implicate procedural due process concerns).

Plaintiff focuses more on the physical conditions of his cell, while the prisoners in *Lekas*, *Williams*, and *Thomas* focused on the restrictions to movement, prison programs, commissary, and other privileges. Nevertheless, the conditions of Plaintiff's segregation – more insects, less trash removal, a stained toilet, and a lack of cleaning supplies – are not so harsh or atypical of the ordinary incidents of prison life to give rise to constitutional due process concerns with his disciplinary hearing. *See Keel v. Dovey* 459 F. Supp. 2d 946, 952, 955 (C.D. Cal. 2006) (segregation confinement to a cell with greater mice and bird infestation and significantly less cleaning supplies, which may have resulted in fungus was not so atypical to give rise to procedural due process rights); *cf. Wilkinson v. Austin*, 545 U.S. 209 (2005) (Supreme Court articulated circumstances that amount to "atypical and significant hardship" sufficient to trigger due process protections, and noted that an indefinite transfer to a state's highest maximum security facility, with 23-hour a day cell restriction with a constant light on, limited exercise in a small indoor room, virtually no human contact, and a loss of parole consideration constituted atypical and significant hardship). Plaintiff's complaints about his segregation appear to be the type of change in conditions with simply moving from one area of a prison to another. Although the segregation conditions were not as nice or pleasant as those in general population, such conditions were not so harsh that they were atypical of the ordinary incidents of prison life to give rise to a constitutional liberty interest.

Additionally, Plaintiff's segregation confinement did not give rise to procedural due process concerns for another reason. Plaintiff admits that the conditions of his disciplinary segregation did not differ from administrative segregation. Plaintiff acknowledged that the adverse conditions

described above existed throughout F-House, "the whole entire building." (R. 88, Exh. B, Pl.'s Depo, 70.) According to Plaintiff, F-House housed not only inmates in disciplinary segregation but also inmates in administrative segregation waiting to be placed in general population. (*Id.*, 33-34.) "[Where] conditions of disciplinary segregation [are] completely indistinguishable from conditions of discretionary segregation," an inmate cannot establish that the disciplinary segregation conditions were atypical of the incidents of ordinary prison life. *Lekas*, 405 F.3d at 613; *Wagner v. Hanks*, 128 F.3d 1173, 1175 (7th Cir. 1997). This is because administrative segregation is a reasonably anticipated incident of prison life for all prisoners. *Lekas,* 405 F.3d at 609.

Accordingly, Plaintiff's segregation confinement did not implicate procedural due process requirements. This reason alone is sufficient for summary judgment for Defendants on Plaintiff's challenges to his disciplinary proceedings. The court further notes in the next section that Plaintiff received due process with respect to the discipline he received.

### 2. Plaintiff received due process with his disciplinary proceedings

Even assuming that Plaintiff was entitled to procedural due process rights, Plaintiff received such process. As noted earlier, constitutional due process for a prison disciplinary hearing entitles the inmate to: (1) written notice; (2) the opportunity to be heard; (3) the opportunity to call witnesses and present evidence; and (4) a written statement of the decision and evidence relied upon. *Rasheed-Bey v. Duckworth*, 969 F.2d 357, 361 (7th Cir. 1992), citing *Wolff v. McDonnell*, 418 U.S. 539 (1974). The record demonstrates that he received a disciplinary ticket prior to his hearing. (R. 88, Defs.' Rule 56.1 Statement, ¶¶ 14-16; Exh. A (copy of ticket), Exh. B, Pl's Depo. 35-38.) Plaintiff was present at the May 9, 2007, hearing. Although he contends that his only statement at the hearing was pleading not guilty to participating in a drug test on May 1st, (R. 99,

Pl.'s Rule 56.1 Statement, ¶ 12), Plaintiff acknowledges that he was present at the hearing and asked how he pleaded to the charge of testing positive for drug use. (*Id.*)

The parties differ as to whether Plaintiff said anything else at the hearing. The hearing officer, Daryl Johnson, avers in an affidavit that Plaintiff admitted that the drug test showed positive and that he was not taking any medications at the time of the test, but contended that the urine test was in some way contaminated. (R. 88, Exh. D, Johnson Aff.) Plaintiff states that he only denied taking a drug test on May 1, 2007 (as opposed to May 2). However, Plaintiff does not state what else he wanted to do at the hearing. He cites to no evidence or testimony that he wanted to present. At most, he repeats his contention that the drug test was contaminated. Courts have held, however, that a single drug test is sufficient to support a prison disciplinary action. *See Allen v. Purkett,* 5 F.3d 1151, 1153 (8th Cir. 1993); *Peranzo v. Coughlin*, 850 F.2d 125, 126 (2d Cir. 1988); *Vega v. McCann*, No. 08 C 4536, 2010 WL 1251444, 3, n.1 (N.D. Ill. 2010) (Coar, J.).

Although there was some confusion with whether there was a second hearing on May 15, 2007, the summary judgment evidence makes clear that there was no hearing on that date, but instead, the hearing officer simply reviewed the evidence presented from the May 9th hearing along with the corrected disciplinary ticket showing the correct date the drug test was administered.

The summary judgment evidence thus demonstrates that Plaintiff received notice; he was present and spoke at a hearing, and there was a written statement of the hearing officer's decision, which was supported by some evidence. Accordingly, even if Plaintiff was entitled to due process for his disciplinary proceedings, the record demonstrates that he received such process. Summary judgment is thus granted for the Defendants, and Plaintiff's challenges to this disciplinary proceedings are denied.

**B. Conditions of Confinement**

As discussed above, the conditions of Plaintiff's segregation confinement were not atypical or sufficiently harsh to give rise to procedural due process concerns with his disciplinary proceedings. Nor do these conditions establish an Eighth Amendment violation with respect to Plaintiff's challenge to the conditions of his segregation confinement.

The Eighth Amendment requires a minimum standard for the treatment of prisoners. The conditions of a prisoner's confinement must be at least "humane" with "adequate food, clothing, shelter, and medical care." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Sain v. Wood*, 512 F.3d 886, 893-94 (7th Cir. 2008). Prison conditions cannot involve "the wanton and unnecessary infliction of pain." *Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008). Prisoners must receive "reasonably adequate ventilation, sanitation, bedding, hygienic materials, and utilities." *Vinning-El v. Long*, 482 F.3d 923, 924 (7th Cir. 2007), quoting *Gillis v. Litscher*, 468 F.3d 488, 493 (7th Cir. 2006)

To establish an Eigth Amendment violation, an inmate must establish both: (1) that the conditions at issue were "sufficiently serious" such that they denied him of the "minimal civilized measure of life's necessities," and (2) if the conditions were sufficiently serious, that the defendants acted with deliberate indifference to those conditions, i.e., that they actually knew of the conditions but refused to take reasonable steps to resolve them. *Townsend*, 522 F.3d at 773, quoting *Farmer*, 511 U.S. at 834.

**1. Plaintiff's segregation conditions were not sufficiently serious**

None of Plaintiff's segregation conditions, whether considered individually or together, were sufficiently serious to implicate constitutional concerns. Plaintiff states that food trays were

not picked up immediately after each meal; that his toilet had a stain and a urine odor; that he was not given cleaning supplies; and that there were roaches, little black bugs, and mice. (R. 88, Exh. B, Pl.'s Depo., 72-80.)

With respect to food trays, Plaintiff acknowledges that trays were regularly picked up with each meal, though he would have preferred that they be collected immediately following each meal. (*Id.*, 72-74.) With respect to Plaintiff's toilet, he stated that it had a brown stain around the water line, that it was "real odorous [and] smell[ed] like urine," (*id.*, 76), but he did not indicate that the odor was overwhelming. With respect to the lack of cleaning supplies, his description of how he cleaned his cell in general population (using a cleaning agent and his own clothes for the walls), (*id.*, 80-81), indicates that he could have at least used water and his own clothes in segregation to clean his cell. *Pritchett v. Page*, No. 00 C 8174, 2000 WL 1129891, 7 (N.D. Ill. 2000) (Nordberg, J.) (prisoner who was provided a bucket and mop once a month and had to use his own soap to clean his cell did not set forth a claim of unconstitutional condition of his confinement).

As for a problem in segregation with roaches, little black bugs, spiders, and mice, Plaintiff does not indicate that the problem was constant or rampant or that bugs or mice crawled on him or bit him. (R. 88, Exh. B, Pl.'s Depo, 81-83.) *See, e.g., Antonelli v. Sheahan*, 81 F.3d 1422, 1431 (7th Cir.1996) (allegation that roaches and mice were rampant, crawling on inmate's body stated a claim of an unconstitutional condition of confinement, particularly where the jail had sprayed only twice during a 16-month period );*White v. Monohan*, 326 Fed. Appx. 385, 388, 2009 WL 1034265, 3 (7th Cir. 2009) (five-year exposure to roaches, mice, bees, and wasps that stung and bit detainee stated a claim of unconstitutonal condition of confinement); *Gurley v. Sheahan*, No. 06 C 3454, 2009 WL 2178685, 5 (N.D. Ill. 2009) (Pallmeyer, J.) (claim that inmate endured roach and rat

infestation, found as many fifty roaches crawling on belongings on occasions, but stated no physical injury, did not establish an Eighth Amendment violation).

With respect to Plaintiff's fungus and/or rash that was diagnosed while he was in F-House, the medical records do not indicate that it was caused from unsanitary conditions. (R. 88, Exh. G, medical records from 1/4/08.)

Plaintiff's segregation conditions certainly were unpleasant, but harsh and uncomfortable living conditions do not necessarily equal unconstitutional conditions. *Dixon v. Godinez*, 114 F.3d 640, 642 (7th Cir. 1997). Courts have repeatedly recognized that "inmates cannot expect the amenities, conveniences and services of a good hotel." *Harris v. Fleming*, 839 F.2d 1232, 1235 (7th Cir. 1988). Cases where the confinement conditions satisfied the objective component have involved far harsher surroundings. *Jackson v. Duckworth*, 955 F.2d 21, 22 (7th Cir. 1992) (prisoner "forced to live with "filth, leaking and inadequate plumbing, roaches, rodents, the constant smell of human waste, poor lighting, inadequate heating, unfit water to drink, dirty and unclean bedding, without toilet paper, rusted out toilets, broken windows, [and] ... drinking water contain[ing] small black worms which would eventually turn into small black flies" which were "strikingly reminiscent of the Black Hole of Calcutta"); *Johnson v. Pelker*, 891 F.2d 136, 139 (7th Cir. 1989) (inmate housed in cell without running water and in which cell was smeared with feces while ignoring his requests for cleaning supplies).

As noted by the Supreme Court, "extreme deprivations are required to make out a conditions-of-confinement claim." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). The present case, however, presents no indication that Plaintiff was forced to live in filth and squalor. Rather, food trays were not picked up as quickly as he would have liked, he was not able to clean his cell with

cleaning materials the way was able to do in general population, and the exterminator sprayed only on the outside areas and not in the cells. "The Eighth Amendment is not violated when the hygienic conditions in a prison simply do not meet the prisoner's personal standards of cleanliness." *See Jordan v. Peters*, No. 95 C 4163, 2000 WL 14925, * *4 (N.D. Ill. Feb. 8, 2000) (Pallmeyer, J.).

Accordingly, viewing the evidence in a light most favorable to Plaintiff, he cannot establish that the conditions of his segregation confinement satisfied the objective prong of an Eighth Amendment deliberate indifference claim.

### 2. The evidence does not show deliberate indifference by Defendants

Not only has Plaintiff not shown that the conditions were sufficiently serious to satisfy the objective prong of his deliberate indifference, but the record contains no evidence that Defendants were aware of the conditions.

Plaintiff filed only two grievances about the conditions of his confinement: one on August 15, 2007, and another on December 14, 2007. (R. 99, Exh. K.) Plaintiff presented these grievances to his counselor, Gia Holsonton, but he never received a response. (R. 88, Exh. B, Pl.'s Depo 91-93.) Gia Holsonton, however, is not a defendant in this case. Plaintiff admits that he filed no other grievances nor sent letters or complaints to Defendants about the conditions of his confienment. (*Id.*, 92-93.) Although Plaintiff testified at his deposition that Ms. Holsonton sent him a note stating that she put the grievances in the grievance office, (R. 88, Exh. B, Pl.'s Depo., 92-93), Ami Workman avows in her affidavit that she was not assigned to address the grievances about the conditions of Plaintiff's confinement and that she did not know about these grievances until this suit. (R. 88, Exh. E, ¶ 11) Plaintiff provides no evidence countering Workman's affidavit, and he does not respond to Defendants' Rule 56.1 Statement contention that Workman knew nothing about

the grievance. (R. 88, Defs.' Rule 56.1 Statement, ¶ 47.) "[W]hen confronted with a motion for summary judgment, a party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact which requires trial." *Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir. 1988).

The record thus demonstrates that, even if the conditions in segregation were sufficiently serious, there is no evidence that any of the Defendants were actually aware of the conditions such that they acted with deliberate indifference to them. Accordingly, the evidence shows that Plaintiff cannot establish either prong of a deliberate indifference claim, and Defendnats are entitled to summary judgment on this claim.

### C. There is no constitutional right to a prison grievance system

It is unclear from Plaintiff's amended complaint whether his allegations that his grievances were not addressed were intended to bolster his claim of deliberate indifference or to state a separate claim that he was denied a right to responses to his grievances. (R. 22, Amended Compl., 14, 16.) To the extent he sought to support his claim of deliberate indifference with respect to the issue that was the subject of his grievances, the court has already addressed the relevance of the grievances. To the extent Plaintiff asserts a separate claim that his grievances were not properly addressed, there is constitutional right to a prison's grievance system. "A state-created prison grievance procedure is simply a procedural right and does not confer any substantive right upon an inmate." *Massey v. Helman*, 259 F.3d 641, 647 (7th Cir.2001). Although Plaintiff must have filed grievances to exhaust his claims, see 42 U.S.C. § 1997e(a), exhaustion is not an issue in this case and the lack of a grievance system or the failure of prison officials to adhere to a prison's grievance

procedures does not give rise to a separate civil rights claim. *Massey*, 259 F.3d at 647; see also § 1997e(b) ("the failure of a State to adopt or adhere to an administrative grievance procedure shall not constitute the basis for an action under section 1997a or 1997c of this title").

## IV. CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment [86] is granted. Plaintiff's claims are denied. All other pending motions not specifically addressed herein are denied as moot. This case is terminated.

ENTER: _____
            **Sharon J. Coleman**
            **United States District Court Judge**

**DATED: December 17, 2010**